1           UNITED STATES DISTRICT COURT
             DISTRICT OF MASSACHUSETTS
2                 Boston Division

3   WHITMAN & COMPANY, INC.,      :    Case No. 14-cv-12047-ADB

4       Plaintiff,               :

5       v.                       :    Boston, Massachusetts
                                      Friday, June 12, 2015
6   LONGVIEW PARTNERS (GUERNSEY) :    11:39 a.m.
    LIMITED, ET AL.,
7                                :
        Defendant.
8   : : : : : : : : : : : : : : : : : : : : : : : : : : : ::

9

                       TRANSCRIPT OF HEARING ON:
10            (20, 18) DEFENDANTS' MOTIONS TO DISMISS
             BEFORE THE HONORABLE JENNIFER C. BOAL,
11                UNITED STATES MAGISTRATE JUDGE

12  APPEARANCES:

13  For the Plaintiff:          Seyfarth Shaw
                                BY:  WILLIAM L. PRICKETT, ESQ.
14                              Two Seaport Lane, Suite 300
                                Boston, MA  02210
15
    For the Defendants:         Weil, Gotshal & Manges
16                              BY:  PATRICK O'TOOLE , JR., ESQ.
                                100 Federal Street
17                              Boston, MA  02110

18
    Transcript prepared by:     JANICE RUSSELL TRANSCRIPTS
19                              1133 Tanager Trail
                                Virginia Beach, VA  23451
20                              (757) 422-9089
                                trussell31@cox.net
21

22  Proceedings recorded by electronic sound recording; transcript
    produced by transcription service.
23

24

25

1                       P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  We're on the record in the

3     matter of Whitman & Company, Incorporated v. Longview Partners,

4     et al., Case Number is 14-CV-12047.

5              Will counsel please identify themselves for the

6     record?

7              MR. PRICKETT:  Good morning, your Honor.  William

8     Prickett on behalf of plaintiff, Whitman & Company.

9              THE COURT:  Good morning.

10             MR. O'TOOLE:  May it please the Court, Patrick O'Toole

11    for the, for the defendants, your Honor.

12             THE COURT:  All right.  Good morning, everyone.

13             So I have the defendants' motions to dismiss.

14             So, Mr. O'Toole, I'll hear from you first.

15             MR. O'TOOLE:  Thank you, your Honor.

16             Your Honor, as I mentioned, I represent defendants,

17    Longview Partners (Guernsey), Longview Partners LLP, and

18    Longview Partners (UK) Limited.  For ease in the discussion,

19    I'd like to refer to them as Guernsey LLP and UK.  And as

20    you've mentioned, each of the defendants has moved --

21             THE COURT:  And what about the third one?  How do you

22    address the third one?  So you mean Guernsey LLP --

23             MR. O'TOOLE:  And UK.

24             THE COURT:  -- and UK.

25             MR. O'TOOLE:  Yes.  Yep.  There's only three

1  defendants in the case.

2       THE COURT:  Right.  Oh, I see.  Guernsey, LLP.

3  Guernsey, LLP and UK.

4       MR. O'TOOLE:  Yes.  Yes.

5       THE COURT:  It's like that eat shoots and leaves.  Do

6  you know --

7       MR. O'TOOLE:  Exactly, your Honor.

8       As the amended complaint recognized, this action

9  arises from a 2006 exclusive agency agreement between Guernsey

10  and Whitman & Company.  Guernsey and Whitman & Company are the

11  only parties and the only signatories to that agreement.  LLP

12  and UK are not parties and did not sign.

13       Here, UK and LLP are moving to dismiss the three

14  claims against them, specifically the unjust enrichment claim,

15  Count 8; 93A, Count 9; and conspiracy, Count 10.

16       And Guernsey separately is moving to dismiss Count 9

17  and Count 10, conspiracy and 93A.

18       With respect to UK and LLP, the Massachusetts statute

19  of frauds, Gen. Laws 259, chapter 259, section 7, which governs

20  broker and finder agreements, bars the claims that have been

21  brought against them.  The statute expressly bars unjust

22  enrichment claims and derivative claims such as 93A and

23  conspiracy like have been alleged here, which arise out of a

24  claim that somebody was, failed to receive commissions, are

25  also subject to that statute.

1           Moreover, even without the statute of frauds argument,

2    Whitman & Company has failed to state a plausible claim against

3    any defendant on either conspiracy or Section 93A.

4           Just a bit of procedural background, your Honor, this

5    case was originally filed in May of 2014.  Whitman & Co. filed

6    its original claim just against Guernsey and LLP alleging

7    breach of contract, unjust enrichment, good faith, and fair

8    dealing.  At that time the defendants moved to dismiss on

9    various grounds, including statute of frauds.

10          In response, Whitman & Co. filed the amended

11   complaint, which dropped its contract claims against LLP and

12   its good faith and fair dealing claims against LLP, but it

13   filed the amended complaint which added unjust enrichment

14   claims against LLP and UK and also added UK as a party and

15   added the additional claims of 93A and conspiracy.

16          I think that I'd like to highlight some of the key

17   allegations in the amended complaint that I think are really

18   relevant to what we're arguing.  As I mentioned, Paragraph 10

19   of the amended complaint recognizes that Whitman entered into

20   an exclusive agency agreement with Guernsey and that's the

21   contract under which its contract claims are based.

22          Section 11 admits that in 2007 Whitman & Company

23   amended that contract to substitute Whitman & Co. as the sole

24   contracting party with Guernsey.  Exhibit A to the amended

25   complaint makes clear that the amendment just substituted

Whitman & Co. as a party.  All other terms and conditions of the agreement remained in full force and effect without modification.  UK and LLP were never added as parties to that agreement.

The term of the agreement is from January of '06 to December of 2010 and under the agreement Whitman provided broker-finder type services.  As the complaint indicates, he introduced investors, arranged meetings.  The agreement also provides that Guernsey, not UK or LLP, would pay Whitman Company a retainer of a hundred thousand, would pay Whitman agent fee, agency fees, which this case is about, your Honor.

Importantly, the amended complaint also recognizes that Guernsey, in fact, paid agency fees to Whitman on certain accounts.  It recognizes that Guernsey made those agency fee payments to Whitman & Co. between 2008 and the third quarter of 2013; that starting in the third quarter of 2013 Guernsey stopped making these payments; that, that the decision to stop was Guernsey, is what's alleged in the case; that Whitman was told in February 2014 that there'd be no further payments because of a settlement and investigation relating to North Carolina.

THE COURT:  And I believe the plaintiffs had attached that e-mail communication that backs up that allegation in their opposition and I think in a footnote in their reply you said you didn't have objection considering that, I assume

1  because it's mentioned in the complaint.

2          MR. O'TOOLE:  Yeah.

3          THE COURT:  You're not doubting that today?

4          MR. O'TOOLE:  No, we're not, your Honor.  And we also

5  -- what we do dispute, though, your Honor, is the suggestion

6  that that was sent on anybody other than Guernsey.

7          THE COURT:  Okay.

8          MR. O'TOOLE:  There's no indication it was and we

9  think the terms of that itself state exactly why they were not

10 like Guernsey was making the decision not to pay.

11         On March 26th, the amended complaint admits that it,

12 that Whitman & Co. made a written demand on Guernsey, not UK or

13 LLP, for payment of the agreement.  And as I mentioned, this

14 action was commenced two months later in May.

15         First, with respect to the unjust enrichment claim

16 against UK and LLP, your Honor, again, Chapter 259, Section

17 7 -- it's the Massachusetts statute on broker and commission

18 agreements -- as I mentioned, the allegations in the complaint

19 and the services that are described in the exclusive agency

20 agreement are those of a broker-finder.  We cited cases such as

21 Menturk (phonetic) that described what is meant by a broker and

22 finder and the amended complaint and there really doesn't

23 appear to be much contention that he wasn't doing the services

24 of broker-finder.

25         Chapter 259, Section 7, is very specific, your Honor.

1  It says that contacts like this "shall be void and

2  unenforceable unless such agreement is in writing, signed by

3  the party to be charged."  Here, UK and LP, LLP never signed

4  the agreement.

5       Moreover, the statute goes further and it's a little

6  bit different than some other statute of frauds because it says

7  quasi contract claims such as unjust enrichment, like alleged

8  here, are also barred.  And the cases that we -- we cited

9  United States Auditing (phonetic), a Mass. case that describes

10  this, and also, there's some appeals court, Massachusetts

11  appeals court cases like Cantelle (phonetic) that says this

12  statute's intended to be interpreted broadly.  The statute of

13  frauds in Massachusetts bars the claim Whitman & Co. has tried

14  to bring against UK and LLP for unjust enrichment, in our view.

15       To try to avoid the reach of the statute of frauds,

16  Whitman & Co. relies on a recent case by Judge Casper, License

17  2 Thrill, and I think an analysis of that case indicates that

18  that is not availing to the arguments that they're trying to

19  make forth.  The facts of, of that case, it's important to

20  recognize, is that there, one defendant, FreeCause, entered

21  into a marketing agreement that, that could be subject to the

22  finder's agreement in 2008.  In 2009, defendant -- and I'll

23  probably say this wrong, your Honor -- Rakuten USA purchased

24  FreeCause and the complaint was filed thereafter.

25       In that case -- and the Court specifically says -- the

1    defendants did not dispute that the agreement was a valid,

2    binding agreement.  And it's -- there's defendants, your Honor,

3    but what had happened only two moved to dismiss.  The other one

4    didn't because of jurisdictional issues.  In the, in the motion

5    to dismiss there's a footnote that references it.

6          Rakuten USA, presumably, succeeded to FreeCause's

7    obligations under the agreement when it acquired it and

8    certainly, there's nothing in the decision or the Court's

9    rationale to suggest that Rakuten USA argued that it wasn't

10   bound by the contract, that it wasn't a party, or that it

11   wasn't, hadn't accepted the terms of that written agreement.

12         They moved to dismiss and I think it's also important

13   because they moved to dismiss on statute of frauds grounds, but

14   their argument was that the plaintiff's claims, the contract

15   claims they were making, related to an alleged oral

16   modification of the agreement as opposed to the actual written

17   agreement which they agreed they were bound by.

18         The Court disagreed and said the claims -- and it

19   really relates to a CBS Sports contract that's referenced that

20   came into existence around the start of the contract, around

21   2008.  The timing of that and the specific allegation around

22   the CBS Sports agreement is really important to the analysis

23   because the Court said, no, and particularly with that account

24   the plaintiff had not pursued the defendants for failure to

25   abide by the terms of the alleged verbal modification, but,

1  rather, was suing on the actual terms of the agreement,

2  particularly with regard to the introduction of CBS Sports.

3       So there, they were claim -- they were -- the claim

4  was on a written contract that the defendants agreed they were

5  bound by.  And the Court stated in their closing, in summing up

6  her decision, Judge Casper says, "To the extent they're moving

7  to dismiss 93A or unjust enrichment on the grounds that

8  plaintiff is seeking to enforce an unwritten promise to pay

9  commissions, the motion is denied."  And the Court's rationale

10 is because the plaintiff was suing on the terms of a written

11 contract that the defendants agreed was valid and binding.

12      In this situation, it's a much different situation,

13 your Honor.  UK and LLP have never conceded or suggested that

14 they are parties to that agreement, to the exclusive license

15 agreement.  They've never suggested it's binding on them.

16 Quite the contrary.  And in contrast, the plain terms of the

17 exclusive agency agreement indicate that Guernsey's the only

18 entity who ever made payments to Whitman, whoever had that

19 obligation to make payments, and who had the ability to refuse

20 to make payments because they were the only person bound by

21 that agreement.

22      Turning to the 93A claim, your Honor, with respect to

23 UK and LLP, again, the statute of frauds, we believe, bars the

24 93A claim against UK and LLP.  And we've cited cases,

25 particularly the Corporate Development Staples case, which

1    recognizes that when courts look at cases like this that arise

2    out of claims that somebody was deprived a commission, that the

3    derivative claims that come from that are also subject to the

4    93A.  And as I mentioned, the <u>Cantelle</u>, which is the Mass.

5    appeals court case where the appeals court said, "Hey, the

6    Legislature intended that this statute to be interpreted

7    broadly, especially when you're dealing with the concept of

8    these broker-finder agreements."

9         So we would suggest the statute of frauds always, also

10   bars the 93A.

11        But separate and apart from the statute of frauds

12   argument, we think 93A should be dismissed against all

13   defendants because it's, because of several pleading failures,

14   including that there's no unfair and deceptive conduct alleged

15   beyond a breach of contract.  And we've cite, cited <u>GMO Trust</u>,

16   which is Judge Woodlock's decision.  In that case, there was a

17   failure to deliver Venezuelan oil warrants and the 93A claim

18   was based on false statements after there was a failure to

19   deliver.  And in that court, <u>GMO Trust</u>, the Court looked at

20   those claims and said, "They don't rise to the level of a 93A

21   claim."  Instead, the Court said, "To establish a 93A

22   violation, the conduct alleged must not only be wrong, but

23   egregiously wrong."

24        And here, your Honor, none of the extortionate conduct

25   that's required for a 93 violation is present.  There's no

1   suggestion that the parties strung out a long time with

2   assurances that payment would be made or that was an attempt to

3   divert or prevent that person from seeking redress.  These

4   aren't the situations  of <u>Anthony's Pier 4</u> or <u>Arthur D. Little</u>.

5   The, the conduct -- that extortionate type conduct, breach of

6   contract plus, as some of the cases say, extortion, just isn't

7   present here.  This is a breach of contract and the mere

8   resistance to a claim is not a 93A violation.

9           And if you look within 93A specifically at the UK and

10  LLP conduct, the defendants -- strike that, your Honor --

11  Whitman & Co. tries to lump together all the defendants with

12  respect to the 93A claim, but you have to look specifically at

13  UK and LLP.  They were not signatories to that contract.  They

14  had no obligation to pay.  Whitman & Co. had been paid for

15  several years till 2013.  It had been paid by Guernsey.  It

16  says so in the amended complaint.  Guernsey stopped paying

17  because, according to the e-mail that's attached to their

18  opposition, because of an investigation and settlement with

19  North Carolina.  Whitman & Co. never received payments from UK

20  or LLP.  Whitman & Co., frankly, never demanded payment from UK

21  or LLP.  The amended complaint indicates a written demand in

22  March was to Guernsey.

23          So there's no basis to claim UK or LLP did anything

24  unfair or deceptive.  UK and LP [sic] had no obligation to pay,

25  so there, there was no basis for them to ignore a payment

1    request.  The Camden e-mail that's attached, again, your Honor,

2    there's, there is nothing in there to suggest that's sent on

3    behalf of Guernsey or LLP.  In fact, it says there'll be no

4    further payments, which would suggest that it's being sent by

5    Guernsey, given that Guernsey's the only person that's obliged

6    to pay on the agreement.  Because they have -- because UK and

7    LLP had no obligation to pay, there's no basis to claim that

8    they're trying to extort some kind of compromise or raise a

9    frivolous claim.  They don't have the obligation.  They hadn't

10    made the prior payments.  They're not party to the contract.

11    Similarly, there's a suggestion that somehow UK or LLP

12    ignored the March 26th letter.  Again, that was sent to

13    Guernsey.  That's what the complaint says.

14    In their brief they try to suggest that somehow maybe

15    LLP's holding back money from Guernsey to avoid payment.  That

16    allegation's not alleged in the complaint.  By their own

17    admission, it's just conjecture and it can't be the subject of

18    the Court's finding on a motion to dismiss and it's contrary to

19    the language of the exclusive agency agreement.  Nothing in the

20    exclusive agency agreement suggests that LLP was going to pay

21    payments to Guernsey to pay Whitman & Co.  It's Guernsey was to

22    make these payments.

23    And there's no claim that somehow the suggestion that

24    LLP's holding back money was a basis for this not to pay or

25    something that was put forth to Whitman & Co. to suggest that's

1  why they're not paying.  And none of those allegations say

2  anything about UK.

3       UK and LP had no obligation to pay.  So they're not,

4  they were never in a position to do what is claimed to be

5  unfair and deceptive.  They weren't in a position to renege or

6  ignore or assert a basis not to pay because they didn't have an

7  obligation to pay.  Essentially, this is -- 93A boils down to

8  try to lump these, these affiliated companies together and try

9  to create a claim there.

10       Now with respect to Guernsey, your Honor, again, based

11  on the allegation in the amended complaint this is a breach of

12  contract case and mere resistance to a claim is not 93A.  And

13  I'd suggest that the Camden e-mail indicates it was a request

14  for payment.  We're not paying because of this.  Within two

15  months after, they made a demand.  After that, they sued within

16  two months.  It is not the extortionate, extortionate-type

17  conduct you see in Anthony's where you're leading people on.

18       There's also -- with respect to 93A, it's just a

19  subset and they also fail because 93A requires that the unfair

20  and deceptive act of, act has to cause loss.  And with respect

21  to UK and LLP, they had no obligation to pay Whitman & Co.

22  Nothing they did could cause loss and I think on this point the

23  GMO Trust case, again, is instructive.

24       THE COURT:  And I, I read the GMO case and I guess

25  I'm, unless I missed it, I didn't see that it said explicitly

1  that you needed more than the breach of contract damages.

2          So were you arguing by extrapolation, or -- I wasn't

3  quite sure.

4          MR. O'TOOLE:  I was -- I'm looking -- where I'm going

5  on is such misrepresentation did not cause GMO any additional

6  harm beyond continuing failure to receive the warrants.

7          THE COURT:  Okay.

8          MR. O'TOOLE:  So that --

9          THE COURT:  That's the statutory language.

10          MR. O'TOOLE:  Yeah, exactly.  And it's -- yes,

11  exactly.  And it cites to Framingham Auto Sales and Mass.

12  Employers.

13          THE COURT:  Okay.

14          MR. O'TOOLE:  And I'm sorry.  And I, I only have a

15  Westlaw.

16          THE COURT:  That's great.

17          MR. O'TOOLE:  It's *10.

18          THE COURT:  Right.

19          MR. O'TOOLE:  *10.

20          THE COURT:  I saw the cite so --

21          MR. O'TOOLE:  Oh, okay.  That's -- that's the -- yes.

22          And again, here, the allegations and the claims

23  they're seeking is the failure to pay commissions, which is

24  what is the damage available under the exclusive agency

25  agreement that provided they could put that case forward.

1          The next argument, your Honor, is that this 93A claim

2    has to fail because it's not trade or commerce.  And with

3    respect to UK and LLP, there's no commercial transaction.

4    They're not a party to the agreement.  They had nothing to do

5    with that, that agreement.  The only transaction at issue in

6    the case is the exclusive agency agreement between them,

7    between Whitman & Co. and Guernsey.

8          And then, your Honor, I think the Debnam case, the

9    recent First Circuit case, is really directly on point on the

10   trade or commerce argument we're trying to make.  And I -- some

11   of the facts, I think, are really important to go over and

12   it's --

13          In Debnam, the plaintiff was an independent contractor

14   for FedEx.  He contracted to use their trucking equipment and

15   personnel to do FedEx deliveries.  In decision on the summary

16   judgment, the court said it was undisputed that, that "The

17   plaintiff simultaneously operated up to nine delivery routes,

18   each route requiring a separate driver and vehicle.

19   Plaintiff's business employed 60 other drivers to do the work."

20   And that's from the summary judgment decision, 2013 Westlaw

21   5434142.

22          It came to the First Circuit after Judge O'Toole had

23   dismissed it on a, saying it was an employee contract.  The

24   appeal said, "Hey, I was an independent contractor trying to

25   preserve the 93A claim."  And the court's analysis is really

instructive.  It says that for Section 11 to apply both parties have to engage in trade, trade and commerce and offering services like Whitman & Co. did here or the delivery services in Debnam, Debnam, only qualifies if that service is offered generally by the person for sale to the public in a business transaction.

The First Circuit upheld the dismissal not on the grounds of that he was an employee, as Judge O'Toole did.  He said it didn't matter if he was an employee or an independent contractor and even if you presumed he was an independent contractor, it's still not trade or commerce because the plaintiff's delivery services were not generally for sale to the public in a business transaction, but were, rather, exclusively provided to FedEx.

Like Whitman & Co.'s business, Debnam involved an exclusive relationship where the services were devoted to FedEx.  Any attempt to distinguish that, there's no suggestion in the amended complaint this was anything other than an exclusive relationship.

Further, if -- in looking at the pleadings in Debnam, the motion to dismiss attaches the contract to the -- to -- in Debnam and that would even suggest that Debnam might have had the right to seek other work.  There's specific provisions in it, but there's no allegation in the complaint that he did anything but an exclusive relationship.

1          And that's what we have here, your Honor.  Just like

2     Debnam, the amended complaint is clear Whitman did these

3     services exclusively for Guernsey and as a result, doesn't

4     suffice for 93A.

5          We also think that Pine Poly on primarily and

6     substantially, the recent decision by Judge Gorton, it

7     really -- the focus on substantial, primarily and substantially

8     in Massachusetts is that the center of gravity of circumstances

9     giving rise to the claim.  That's what people -- what -- what

10    Judge Gorton suggested has to be analyzed.

11          And here, the plaintiff resides in Massachusetts or is

12    Massachusetts, but none of the other conduct or connections are

13    present to, to give it a basis to be primarily and

14    substantially Massachusetts.  The defendants are from the

15    British Isles.  None has a Massachusetts company.  The conduct

16    didn't occur in Mass.  None of the clients identified in the

17    amended complaint are Massachusetts.  The settlement agreement

18    -- the settlement discussion that they suggest was the

19    frivolous basis relates to North Carolina.

20          So it doesn't have the connection to Massachusetts

21    that requires it to be tethered to the 93A.

22          So we would suggest that 93A should be dismissed on

23    all defendants for all of these reasons.

24          And in the conspiracy claim, your Honor, first, if the

25    Court accepts any of the arguments on 93A, the conspiracy

1    claim, either the statute of frauds or the other grounds I

2    ticked off, your Honor, this claim must be dismissed because

3    there's no underlying tortious conduct that's identified in the

4    complaint besides 93A violation.  And even if the Court doesn't

5    accept those 93A arguments, this count should still be

6    dismissed against all of the defendants, your Honor, because

7    here, Whitman & Co.'s alleging a concerted-action conspiracy

8    and that requires -- the case law that both parties, I think,

9    have cited requires that, that the defendants have knowledge of

10   the other's tortious conduct; that they act with the intent to

11   substantially assist; that they give substantial assistance to

12   the tortious conduct; and that assistance is a substantial

13   factor in causing the tort.

14        And if you take a look at the cases they cite to say

15   this is what a concerted-action conspiracy looks like.  None of

16   this conduct is the type of conduct or level of conduct as

17   alleged.  In Aetna, you have a wife who's insured by Aetna who

18   brings six false claims supported by a defendant who provided

19   false appraisals about work her husband in the auto body

20   industry allegedly did where she reports to Aetna that the work

21   was completed.

22        In Cothroes (phonetic), you have an improper

23   foreclosure where somebody who doesn't have title to property

24   transfers, does a fraudulent assignment to another party to

25   foreclose on that.

1          In <u>Brothers</u>, you have two police officers who, who

2    worked together to turn on an Internal Affairs officer by

3    conducting an inaccurate investigation and destroying evidence

4    in an effort to have her fired.

5          Or in <u>Crooker</u>, you have attorneys who try to

6    orchestrate a majority buyout and a breach of fiduciary duty.

7          If you compare that to the actions, the conduct that's

8    alleged here relating to UK and LP, again, the claims against

9    UK and LLP are wholly conclusory.  They try to just group them

10   altogether with Guernsey.  There's no facts that UK or LLP

11   participated in or provided substantial assistance, no facts

12   that they did anything where they had, especially when they had

13   no payment obligation under the agreement.  There's nothing to

14   suggest they had the requisite knowledge that they were helping

15   somebody or providing a substantial, substantial assistance.

16   UK and LP had no payment obligation to Whitman.

17         So there's no inference that they ignored payment

18   demands, withheld payment or tried to exact a compromise.

19         We'd also suggest that it's instructive to look at the

20   <u>Platton</u> (phonetic) case we, we cited where -- it's a breach of

21   contract case -- the First Circuit says that has been somehow

22   misconstrued because of corporate affiliations into a

23   conspiracy-type claim.  And we think that's what's going on.

24         For Guernsey, your Honor, the conspiracy claims also

25   fails because it's, again, it's a breach of contract claim.

1    You can't breach, you can't conspire to breach a contract and

2    you can't conspire with yourself, your Honor.

3              For these reasons, we request that the complaint be

4    dismissed in its entirety as to UK and LLP and that Counts 9

5    and 10 be dismissed as to Guernsey, your Honor.

6              THE COURT:  All right.  Thank you.

7              Mr. Prickett.

8              MR. PRICKETT:  Thank you, your Honor.

9              I think I will take the arguments in the order that

10   they were just -- just --

11             THE COURT:  That would be great.

12             MR. PRICKETT:  -- presented by Mr. O'Toole.

13             So I'll start with the statute of frauds.

14             THE COURT:  Uh-huh (indicating an affirmative

15   response).

16             MR. PRICKETT:  And assuming for the sake of argument

17   that that statute, 259, Section 7, in fact, would apply to the

18   contract here --

19             THE COURT:  And, and that was going to be one of my

20   questions.

21             MR. PRICKETT:  Yeah.

22             THE COURT:  Are you disputing that it applies?

23             MR. PRICKETT:  Frankly, we don't really take a

24   position in our papers --

25             THE COURT:  Okay.

1        MR. PRICKETT:  -- on that.  I'm not sure that I want

2    to -- I'm going to concede that it does apply here.

3        THE COURT:  Okay.

4        MR. PRICKETT:  In fact, I'm not going to concede it

5    does apply here.

6        THE COURT:  Okay.

7        MR. PRICKETT:  But let's assume for the sake of

8    argument that it does apply here.  I think it's irrelevant

9    because the purpose of that statute like any statute of frauds,

10   regardless of what's stated or enacted in, is to avoid a

11   situation where a plaintiff essentially, because there is no

12   written contract, tries to allege that there was a contract

13   either orally or on some other basis or some sort of quasi

14   contract, as, as is the case here in this statute.  In other

15   words, attempting to essentially create a fraudulent claim that

16   there was, in fact, a contract.  And that's the purpose of it

17   and that's why it doesn't apply here.  Because we have a

18   written agreement and there is no dispute by the defendants

19   that there is a written agreement between my client, Whitman,

20   and Guernsey.  And for that reason alone that argument is

21   completely misplaced by the defendants.

22       THE COURT:  Even as to, what are we calling them here,

23   LLP and UK?

24       MR. PRICKETT:  Yes.

25       THE COURT:  Okay.

1          MR. PRICKETT:  We're not asserting any contract claim

2     against them.  So why would they --

3          THE COURT:  Oh, because --

4          MR. PRICKETT:  Why would they --

5          THE COURT:  -- of unjust enrichment.

6          MR. PRICKETT:  Right.

7          THE COURT:  Okay.

8          MR. PRICKETT:  Exactly.

9          So --

10          THE COURT:  But what about Mr. O'Toole's argument that

11     the, the breadth of the statute includes quasi contract?

12          MR. PRICKETT:  Sure.  And that's why I think the

13     License 2 Thrill case --

14          THE COURT:  I see.

15          MR. PRICKETT:  -- is critical here.

16          THE COURT:  Okay.

17          MR. PRICKETT:  Because there really isn't any case law

18     on this other than that case because why would someone assert a

19     statute of frauds defense when there's actually a written

20     contract?  And it makes perfect sense.  It's, it's a sleight of

21     hand that the defendants are trying to, to assert here.  It's

22     creative, I will give them that, but it doesn't work and Judge

23     Casper's decision, I think, really shows that.

24          I think it's on all fours.  I think the type of

25     arrangement in License 2 Thrill is very akin to the contract

here and the only way that I heard and saw in their opposition and, actually, their reply brief that they can distinguish this is to make the presumption that somehow when FreeCause was acquired by the other entity, Rakuten, that, presumably, I think is the word they used, the obligation was acquired by the acquiring company. There's nothing in the decision that says that. In fact, I think the decision supports the opposite of that, which is the, the only claim, contract claim here in License 2 Thrill was against the party that the, the only party that signed the contract.

So I think it really is on all fours here and although the analysis by Judge Casper isn't elaborate, clearly she says that, "To the extent that the defendants move to dismiss the 93A and unjust enrichment claims on the grounds that plaintiff isn't seeking to enforce an unwritten promise, the court denies the motion for the reasons discussed above." In other words, if there was, in fact, a written agreement.

So again, the slight difference in that case is that the allegation was that there was also a -- well, there's a defense, "We thought there was a modification." That doesn't apply. That doesn't apply here, but I think that's beside the point. The point is is that there were unjust enrichment and 93A claims asserted in that case against the parties other than the party to the contract. Those parties sought to dismiss those claims on the grounds of the statute of frauds and the

 1    court denied the motion on the grounds that there was a written

 2    contract between at least one of the parties.

 3            So I think that disposes of the statute of fraud

 4    argument with respect to all of the defendants that assert it.

 5            The other point I would, I would make on the statute

 6    of frauds is that every other case that the defendants cite in

 7    their moving papers, their opposition papers and their reply,

 8    the, the facts in those cases were that there was no written

 9    agreement.  And those are, I think, critical distinctions to

10    our case.

11            Now let me turn, if I may, to 93A unless there are

12    questions.

13            THE COURT:  No.  That's fine.

14            MR. PRICKETT:  Okay.

15            93A, the question here, Your Honor, is whether we

16    assert a plausible claim, not whether we can prove our claim

17    based on what's alleged in the complaint.  And I would suggest

18    to the Court that what we do allege in our complaint, we

19    believe, is the tip of the iceberg.

20            What we allege in this complaint is that we have a

21    money management firm in the UK which it's not one company.

22    It's three -- it's actually several companies, but three of

23    which are defendants in this case.  And I think it's important

24    for the Court to recognize, as the amended complaint states,

25    these companies don't act in isolation from one another.  They

1    are part of the family of, of companies that work together in

2    order to provide services to their clients.

3            THE COURT:  And I saw those allegations --

4            Mr. PRICKETT:  Yes.

5            THE COURT:  -- but there don't seem to be any

6    specifics about, that back up those allegations.

7            So, for example, alleging overlapping corporate

8    ownership by naming the overlapping persons and those sorts of

9    allegations.

10           MR. PRICKETT:  Okay.  That's true.  We do not identify

11   the names of the principals specifically in that complaint.

12   That, that is accurate, but the fact that remains is that that

13   is the case and I have not heard any dispute from the

14   defendants as to that issue.

15           The complaint does state that the management entity,

16   the entity that actually managed the, manages the funds that

17   are entrusted to Longview, actually two of them.  It's, it's

18   LLP and UK.  UK is the managing member of LLP.  Those folks

19   actually managed the money.  Guernsey is the back office

20   operation that deals with the administration of the, of the

21   funds, including the transfer of assets and disbursement of --

22   of -- disbursements that the entities owe, including the

23   disbursements in the amounts owed to Whitman.

24           So as a matter of fact, it is alleged that the money

25   that was earned by LLP and UK, a portion of that based on the

1    percentages in the contract has to be paid to Whitman and the

2    entity that actually physically pays Whitman is Guernsey.

3         So as is alleged in the complaint, the money is

4    transferred to Guernsey.  Doesn't just appear at Guernsey

5    metaphysically.  It has to be transferred from UK to, either UK

6    or LLP, or both to Guernsey and then from Guernsey to Whitman.

7         So that, that is an important fact that's alleged

8    that, that undermines, or is the foundation for the 93A and

9    simple conspiracy claims.

10        THE COURT:  And, you know, I believe that you've also

11   stated both in the complaint and the brief that the

12   extortionate conduct was designed to coerce Whitman to accept a

13   lesser sum in settlement, but where are the factual allegations

14   that support that conclusion?

15        MR. PRICKETT:  The factual allegations are the

16   following -- and I will, I will state candidly that they're

17   somewhat passive aggressive.  Their behavior is somewhat

18   passive aggressive and that's when I say --

19        THE COURT:  Not your statements are passive

20   aggressive.

21        MR. PRICKETT:  Yeah.

22        -- that we don't have an e-mail that says, "Dear

23   Mr. Whitman, We hereby refuse to pay you and we're not going to

24   tell you why," or an e-mail that says, "We will pay you," and,

25   in fact, they don't.

1    So when I say it's the tip of the iceberg we believe

2   that those e-mails exist, but we do not have them in our

3   possession at the moment.

4        But what we do have is you've got these money managers

5   in the UK, very wealthy, very large.  They, for whatever

6   reason, completely ignored Whitman for nearly a year in his

7   efforts to find out why they weren't paying him, what's going

8   on, what's the problem here.  And we believe that it wasn't

9   just one defendant.  We believe they are all acting together

10  because they all are owned by the same people and they all work

11  in a interrelated way.

12       Secondly, when they finally did respond we have the

13  very short terse e-mail, which I would point out is, "I spoke

14  with the folks at Longview Partners."  It doesn't say Longview

15  Partners (Guernsey).  It doesn't say Longview Partners (UK).

16  It doesn't say LLP.  I don't think that was an oversight.  I

17  think that their lawyer was referring to them as a collective

18  and the defendants are forced to argue that,  "Well, presumably

19  or logically he was referring to Guernsey," but I think that's,

20  that's merely argument and certainly doesn't go to whether or

21  not the allegations in the complaint are adequate.

22       That response, from our point of view, is, is not a

23  basis.  It is an invalid and, and non-existent basis to not pay

24  under the contract, certainly with respect to the six other

25  clients that were not North Carolina.  These clients, by the

1    way, are state pension, state pension investors.  But even with

2    respect to North Carolina, we actually don't know what the

3    agreement was between Longview Partners and North Carolina.

4    What we do know is that the net result of that agreement was

5    that North, that Longview partners agreed to reimburse some of

6    the management fees.  We don't know how much or what the

7    magnitude is, but there was some reimbursement.  We had no

8    involvement in that negotiation --

9              THE COURT:  But why --

10             MR. PRICKETT:  -- whatsoever.

11             THE COURT:  Can I consider that, those arguments on a

12   motion to dismiss?

13             MR. PRICKETT:  I don't think you actually can --

14             THE COURT:  Okay.

15             MR. PRICKETT:  -- but I'm addressing them.

16             THE COURT:  Okay.

17             MR. PRICKETT:  Because I don't -- I think the Court

18   needs to look only, or is required to look only at the

19   allegations --

20             THE COURT:  Right.

21             MR. PRICKETT:  -- in the complaint and not to any

22   defensive arguments that are raised in briefing.

23             THE COURT:  Okay.

24             MR. PRICKETT:  Because I don't think -- and I was

25   going to get to that -- but --

1          THE COURT:  Okay.

2          MR. PRICKETT:  But I don't think --

3          THE COURT:  I mean, I think --

4          MR. PRICKETT:  I suppose you -- you could --

5          THE COURT:  -- I can consider the e-mail, but I'm not

6     sure I can consider much beyond that.

7          MR. PRICKETT:  I think that's right.  I think that's

8     right.

9          But even if you could consider it --

10         THE COURT:  Right.

11         MR. PRICKETT:  -- it's not a basis and from our

12    perspective it's a groundless assertion as a defense and we

13    believe that shows, it's made in bad faith and we allege that.

14         And finally, we have a continuing course of conduct

15    when we sent a demand letter before commencing the lawsuit

16    saying, "Look, that is not a basis for, for nonpayment.  If you

17    have any other basis, let's talk about it.  Otherwise, we

18    expect to receive payment."  And again, completely radio silent

19    response.  And I think that this is designed to coerce Whitman

20    into dropping his case or accepting some sort of compromise.

21    And that's why this is not just a breach of contract.  That's

22    why there is a extortionate quality to the behavior of the

23    defendants.

24         The, the defendants argue that with respect to LLP

25    and, and UK because they're not parties to the contract how

1  could they have engaged in any kind of extortionate conduct.

2  And again, our allegation is that they work together as a

3  family of companies.  They -- they -- their functions are

4  interdependent and these principals of the -- of the -- the

5  overlapping, overlapping principals have agreed either to

6  withhold money from LLP to Guernsey or to prevent Guernsey from

7  making the payments to Whitman.

8          As to trade or commerce, your Honor, we are dealing

9  with a investor's broker and a very large money management firm

10  in the UK and then clearly, these two entities are engaged in

11  trade, trade and commerce.  The, the FedEx case that the

12  defendants cite in their reply papers I think is, is off point.

13  And I think it's more like the other cases they cited in their

14  opening, opening papers in the sense that either it's a quasi

15  employment-type relationship, or it has that private type of

16  relationship that is essentially employment like.  And I think

17  one of the key parts to the FedEx case that, that was not

18  mentioned is the finding by the court that the plaintiff in

19  that case never, although had the opportunity, never amended

20  the complaint to allege anything other than an employment

21  relationship.

22          So the court, the First Circuit was, essentially,

23  stuck with that, that set of facts and although it was

24  ultimately determined by the court that it was an independent

25  contractor versus employment, it, they were kin to one another.

        And so while it precluded a wage claim it didn't permit a 93A

        claim because that relationship was private.

                Here, Mr. Whitman is in this business.  There is no

        allegation, there's no evidence and the defendants certainly

        cite nothing that Mr. Whitman was precluded from providing

        these services to anybody else.

                So it's, it's a different set of facts here and I

        think it's, it's an agreement that doesn't apply.

                As to damages, your Honor, the cases are a little bit

        inconsistent on this point.  There are cases which say that the

        -- if you have a contract and a 93A claim in the same case, as

        is often the case, of course, the 93A conduct is going to

        somehow arise out of the contractor relationship and there are

        cases which say that the contract claims can also be recovered

        as 93A damages.  And there are cases which say, such as the

        Arthur D. Little case which say that you can also have a damage

        claim that is in the form of loss of the use of the money or

        expenses.  And certainly, those apply here.  We have a

        situation where Whitman is not only owed under the contract,

        but he is owed additional amounts for the loss of the use of

        that money, which is now going on more than two years as well

        as the expenses that he has incurred in its efforts to try to

        get that, get that paid.

                So I think that Arthur D. Little is, is a good example

        of that and I think that we have alleged sufficiently a damages

1    claim under 93A.

2         Turning to the primarily and substantially test, first

3    of all, notwithstanding the Poly Pine case, which I think is a

4    little bit different and I'll explain why, generally speaking,

5    the law is that it's not an appropriate inquiry at the motion-

6    to-dismiss stage.  It's a fact-intensive inquiry.  It's a

7    balancing of the center of gravity test and courts generally

8    will not dismiss a complaint based on that if that defense, on,

9    on a 12(b)(6) motion.  And we believe that this Court should

10   not as well.

11        Notwithstanding that, we certainly have a

12   Massachusetts plaintiff.  We have conduct that was directed to

13   a Massachusetts plaintiff and there are numbers of, a number of

14   cases which say that the, where the harm is suffered is a

15   germane factor to consider when the appropriate time is to

16   consider, when it is appropriate to consider the center of

17   gravity test.

18        I would also point out that I think it's irrelevant

19   that the clients of Longview are in North Carolina and Idaho

20   and Washington because we're not saying that those folks did

21   anything wrong.  We're saying that Longview hurt us and

22   certainly while the conduct of Longview may have occurred

23   outside the United States, it certainly was felt here in

24   Massachusetts.

25        Finally, with respect to civil conspiracy, it's true

 1   that if the 93A claim falls, that's the -- that -- that is the

 2   tortious conduct.  The conduct that also constitutes a 93A

 3   violation is the conduct that is tortious, as alleged in the

 4   complaint.

 5        So if the Court were to dismiss the 93A, I, I believe

 6   it would also be appropriate to dismiss the conspiracy claim.

 7   But for the reasons I've articulated, we don't think the 93A

 8   claim should be dismissed.  We think it's more than plausible

 9   what these folks are doing to Mr. Whitman.

10        And in terms of the agreement, the complaint lays out,

11   as I've, as I've touched upon, the relationship, the

12   relationship between the three defendants, what their roles,

13   their respective roles are, the complaint and, and the

14   agreement lays this out, and these folks have overlapping

15   principals and from our perspective, they have not acted

16   independent of one another, they have not acted in isolation,

17   they have acted together, and have a plan to either prevent the

18   money from leaving the UK to go to Guernsey, or, if it's

19   already in Guernsey, to prevent it from coming to Whitman.  And

20   that is their plan and that is the basis on the conspiracy.

21   The fact that that conduct may not be as shocking and as

22   egregious as is, as in some of the other cases cited, that

23   doesn't mean it's not out adequately pled in this case.

24        One other point I want to make on the unjust

25   enrichment allegation is that I want to make sure the Court is

1    clear what our position is.  And that is the allegation is that

2    the reason UK and LLP are unjustly enriched is based upon

3    whether that money has been held in the UK, or not.  In other

4    words, if the money has been transferred to Guernsey, it's

5    probably not the case that these other entities have been

6    unjustly enriched, but our allegation is that the money has

7    been held in the UK with LLP and Longview (UK).

8              THE COURT:  Is there an actual allegation in the

9    complaint to that effect?

10             MR. PRICKETT:  Yes.

11             THE COURT:  That the money's being held in the UK?

12             MR. PRICKETT:  That the money has -- the -- the --

13   it's pled in the alternative, your Honor.

14             THE COURT:  Okay.

15             MR. PRICKETT:  If you look at Paragraph 137 and 138,

16   to the extent that those defendants, other than Guernsey -- in

17   other words, the other two defendants -- have failed to

18   transfer to Guernsey the money --

19             THE COURT:  I see.

20             MR. PRICKETT:  -- that they should not be allowed to

21   prosper.  Okay.

22             So that's the basis on which those other defendants

23   have been unjustly enriched.

24             THE COURT:  Okay.

25             Thank you.

1              MR. PRICKETT:  Thank you, your Honor.

2              THE COURT:  Mr. O'Toole, anything --

3              MR. O'TOOLE:  Yes, your Honor, I just have a --

4              THE COURT:  Yes.

5              MR. O'TOOLE:  -- few points.

6              And picking up on, on that point that --

7              THE COURT:  Uh-huh (indicating an affirmative

8    response).

9              MR. O'TOOLE:  -- the last point, your Honor, that

10   allegation itself is just pure conjecture.  That's not a fact.

11   It's a suggestion that possibly --

12             THE COURT:  I might have to construe it in his favor.

13             MR. O'TOOLE:  But, but even his -- his -- even within

14   his complaint and his amended complaint, he says, "To the

15   extent or if they are."

16             But, but further, your Honor, I think it also ties to

17   the point of what's required to be pled here.  And this

18   overlapping concept of different family relationships within a

19   corporate structure, that's not enough to get over the pleading

20   standard.  You have to -- even under 8, Rule 8, you have to say

21   what each defendant did and what, how that supports a claim.

22             And here, your Honor, Paragraph 10 says these claims

23   arise out of an exclusive agreement between Guernsey and

24   Whitman & Co.  There's no suggestion that UK or LLP have

25   anything to do with that agreement; that they've done anything

1   to stop the payment of that;, that they had any obligation to

2   send money to Guernsey under that agreement; that they had in

3   the past when Guernsey was paying.  There's none of that in

4   this complaint, your Honor.  It's bereft of it and it's all

5   conjecture and it's like the Platton case where they try to

6   suggest there's a lot of different corporate entities that have

7   some relationship there must be a conspiracy.  Frankly, it's

8   just not enough.

9        And on the statute of frauds argument, your Honor, the

10  cases suggest that this is the, precisely the type of mischief

11  that the Massachusetts Legislature enacted 259, Section 7 for.

12  It is a claim by somebody who, admittedly, does not have a

13  written contract with UK and LLP and it's a claim to get

14  commissions from them.  And that is exactly why the statute is

15  drafted this way and it's exactly why it goes so far to say

16  implied in locklink like this unjust enrichment claim should be

17  dismissed.

18       And then on the trade or commerce, your Honor, I --

19  again, we, we have to look at the complaint as pled.  It's pled

20  as an exclusive relationship between Guernsey and Whitman & Co.

21  There's no claim that these services were provided by anybody

22  else.

23       And I'd also suggest to your Honor if, in Debnam the

24  contract at issue that the First Circuit said was not trade or

25  commerce revolving [sic] these 60 truck drivers, the contract

1  at issue itself indicated that contractor could offer these

2  services elsewhere.  He didn't.  It wasn't alleged he didn't,

3  he did and that's exactly like Debnam.  And the cite to that,

4  the contract, is 2010 WL 4132719, your Honor.  And that's why

5  Debnam is directly on point here.  It's an exclusive

6  relationship.  That's the rationale of the First Circuit, your

7  Honor.

8          Unless you have other questions, those were just the

9  quick ones I ticked off.

10          THE COURT:  No.  Thank you.

11          And, Mr. Prickett, anything further?

12          MR. PRICKETT:  Very briefly, your Honor --

13          THE COURT:  Okay.

14          MR. PRICKETT:  -- if I may.

15          THE COURT:  Yes.

16          MR. PRICKETT:  This is not the Platton case, your

17  Honor.  The distinction is that in that case the plaintiff was

18  alleging one enterprise.  The defendants were operating one

19  enterprise.

20          THE COURT:  Uh-huh (indicating an affirmative

21  response).

22          MR. PRICKETT:  We are not alleging that here.  We

23  don't, from my point of view, have a basis to assert facts such

24  as pierce, that would support a piercing-the-corporate-veil

25  type.  These are separate entities.  Separate corporate

1  formalities, presumably, are being adhered to.

2         The -- and we are not saying that UK or LLP should be

3  paying under the contract.  That is not our allegation.  We are

4  saying that they shouldn't withhold the money that goes to

5  Guernsey.

6         And finally, with respect to the exclusive agreement,

7  we need to be precise about what that means.  What exclusivity

8  are we talking about here?  There is nothing that they have

9  said and certainly nothing in the agreement that precludes

10 Mr. Whitman from providing these services to any other

11 investment manager that, that he so chooses.

12        So this is different than the FedEx case.

13        Thank you --

14        THE COURT:  All right.

15        MR. PRICKETT: -- your Honor.

16        THE COURT:  Well, thank you both.  It was well argued

17 and well briefed.  So thank you for that.

18        And I will take it under advisement.

19        THE COURTROOM DEPUTY:  All rise.  This Court's in

20 recess.

21    (Proceedings concluded at 12:32 p.m.)

22

23

24

25

1                              CERTIFICATE

2          I, court approved transcriber, certify that the

3     foregoing is a correct transcript from the official electronic

4     sound recording of the proceedings in the above-entitled

5     matter.

6     /s/ *Janice Russell*                    June 18, 2015

7     Janice Russell, Transcriber                    Date